**UNITED STATES of America, Appellee,**

v.

**Sidney D. FURST, Appellant.**

No. 90–5222.

United States Court of Appeals,
Third Circuit.

Argued Aug. 27, 1990.

Decided Nov. 5, 1990.

Robert L. Potter (argued), Frank Arcuri,
Strassburger McKenna Gutnick & Potter,
Pittsburgh, Pa., for appellant.

Wayne P. Samuelson (argued), First Asst. U.S. Atty., Lewisburg, Pa., for appellee.

Before HUTCHINSON and NYGAARD, Circuit Judges, and RE, Judge *.

### OPINION OF THE COURT

HUTCHINSON, Circuit Judge.

Sidney D. Furst, III (Furst), appeals from a judgment of sentence imposed in the United States District Court for the Middle District of Pennsylvania following a remand for resentencing on Furst's prior appeal. *See United States v. Furst*, 886 F.2d 558 (3d Cir.1989) (*Furst I*), cert. denied, —— U.S. ——, 110 S.Ct. 878, 107 L.Ed.2d 961 (1990).

When this matter first came before us in 1989, a jury had convicted Furst on two counts of embezzlement from pension funds, three counts of making false statements in bank records and three counts of making false statements in reports required under the Employee Retirement Income Security Act (ERISA), 29 U.S.C.A. §§ 1001–1461 (West 1985 & Supp.1990). In his first appeal, Furst sought review of the substance of his convictions as well as his sentence.

In the earlier appeal, we reversed three of Furst's convictions and ordered the district court to enter judgments of acquittal on both embezzlement counts and on one count of making false statements in ERISA records. We then remanded the matter for resentencing.[1] *See Furst I*, 886 F.2d at 583.

Furst now appeals from the sentence the district court imposed following our remand.[2] He maintains that the district court did not comply with the mandate of Federal Rule of Criminal Procedure 32(c)(3)(D) when it failed to resolve or expressly disclaim reliance upon disputed facts contained in his presentence investigation (PSI) report. In a related argument, Furst also maintains that the district court violated his right to due process when it sentenced him in reliance upon erroneous information and assumptions. Finally, Furst argues that the order of restitution the district court imposed must be vacated since the record lacks a factual and legal basis for such an order.

We agree that the district court failed to comply with the mandate of Rule 32(c)(3)(D) and failed adequately to set forth the basis of its restitution order in conformity with the applicable case law. Thus, we will vacate Furst's sentence and remand for further proceedings in conformity with this opinion.

### I.

On appeal, Furst focuses solely upon allegations of error arising out of his resentencing. However, a brief summary of the underlying crimes for which he stands convicted is helpful, if not essential.[3]

Furst committed his crimes while employed as a vice president in the trust division of Northern Central Bank (Bank) in Williamsport, Pennsylvania. Among the accounts Furst controlled were ones belonging to the Williamsport Orthopedic Association Defined Benefit Plan (Plan) and the Williamsport Foundation (Foundation). Furst invested funds totalling $909,100.00 belonging to the Plan, the Foundation and others in a commodities corporation in late 1979. Of the total amount, $481,500.00 belonged to the Plan. One year later, all but $236,015.52 of the total commodities investment had been lost. By mid–1981, less than $1000.00 remained. Furst has

---

* Hon. Edward D. Re, Chief Judge of the United States Court of International Trade, sitting by designation.

1. For reasons not relevant to our disposition of this appeal, we directed that Furst's sentencing on remand take place before a district judge other than the one who presided at Furst's trial and original sentencing. *See Furst I*, 886 F.2d at 579–83.

2. Since the crimes Furst committed predate the advent of the sentencing guidelines on November 1, 1987, the guidelines are not applicable to this appeal. *See* 18 U.S.C.A. § 3551 note (West Supp.1990).

3. For a more detailed account of the facts underlying Furst's convictions, see *Furst I*, 886 F.2d at 561–64.

not been charged with any wrongdoing in making the commodities investment.

In October of 1981 Furst directed that an entry be made in the Bank's computer closing out the Plan's investment in the commodities corporation for $180,000.00. This entry was carried forward on the Bank's books, where it continued to grow as it earned interest through September of 1985.

By 1984 it was clear to Furst that there would be no money forthcoming from the commodities corporation to cover the entry. In order to generate the cash to cover his entry, Furst engineered a three-step internal stock trade. At step one, Furst took undervalued stock from a non-ERISA account he controlled and moved it into the Plan's escrow account—an account that he had opened with a $0.00 balance in mid-February of 1985. At step two, he sold the undervalued stock from the Plan's escrow account to an ERISA account for its full market price. At step three, Furst paid the non-ERISA account back from the Plan's escrow account at the original undervalued worth of the stock plus interest at a market rate. This left a $240,000.00 "profit" in the Plan's escrow account to help cover the losses in Furst's commodities investment.[4] Furst then transferred the entire $240,-000.00 to the Plan to cover the amount of money he said remained following the failed commodities investment on the Plan's behalf.

In late December of 1985, Furst engineered a second internal stock trade, this time to cover up part of the loss the Foundation suffered as a result of the failed commodities investment. This second internal trade was identical to the first, except that it utilized different undervalued stock and generated gain totalling $291,-133.70. Furst saw that this gain was distributed into Foundation accounts as if it were proceeds of the commodities investment.

The two embezzlement charges for which Furst was convicted at trial stemmed from these two internal trade transactions. The government charged that the ERISA accounts that purchased the formerly undervalued stock at market price at step two of the internal trade transactions were depleted. The government did not charge Furst with any wrongdoing with respect to the non-ERISA accounts from which undervalued stock was taken at step one of the internal trade transaction.

Deciding Furst's prior appeal, we reversed his two embezzlement convictions because the government failed to prove that the ERISA accounts that purchased the stock at step two of the internal trade transaction paid more than market value. *See Furst I,* 886 F.2d at 565–67. We also reversed one of Furst's three convictions on charges of making false statements in ERISA records. We held that the government failed to prove that Furst knew his statement in ERISA documents in 1983 that the Plan's commodities investment retained a worth of $180,000.00 was false; such proof is a required element of the crime. *Id.* at 568–70.

Because we reversed these three convictions and ordered the district court to enter judgments of acquittal in their places, we vacated the district court's sentence of eight concurrent five year terms of imprisonment and restitution in the amount of $358,757.50. We then remanded the matter so that the district court could resentence Furst on the remaining three counts of making false statements in bank records and two counts of making false statements in reports required under ERISA.

Furst then filed a petition for a writ of certiorari with the Supreme Court of the United States. It denied the petition on January 22, 1990. *Furst v. United States,* —— U.S. ——, 110 S.Ct. 878, 107 L.Ed.2d 961 (1990). Three days later, our Court issued its judgment in lieu of a formal mandate remanding the matter to the district court for resentencing. The maximum sentence of imprisonment Furst faced after our remand was twenty-five years.

---

4. Strictly speaking, Furst transferred the stock at cost, when its cost was substantially lower than its market price. It was the continued excess of the stock's market price over its cost that permitted Furst's scheme to work.

In advance of Furst's resentencing, the district court directed the Probation Office to submit an updated PSI report redacting parts of the earlier report so that the remainder would conform to those counts affirmed on appeal. Also in advance of resentencing, Furst suggested to the district court that it order the Probation Office to calculate what his sentence range would be under the sentencing guidelines, even though the guidelines were inapplicable because the offenses for which Furst stood convicted took place before the guidelines' effective date. *See supra* note 2. The district court adopted Furst's suggestion and ordered the Probation Office to calculate what Furst's sentencing range would be under the guidelines.

The Probation Office issued its revised PSI report to the parties on February 14, 1990. Two days later, Furst sent a letter to the Probation Office listing four objections to the revised PSI report. The district court at sentencing expressly disclaimed reliance upon the portions of the PSI report that were the subject of two of the four objections.

The other two objections constitute the basis of Furst's argument on appeal that the district court failed to follow the dictates of Federal Rule of Criminal Procedure 32(c)(3)(D). These two objections were: (1) that paragraph nine of the PSI report, which relied upon the Bank's factually inaccurate victim impact statement, was itself factually inaccurate and (2) that the Probation Office's estimates of Furst's parole eligibility and guidelines sentence range were factually inaccurate.

The substance of both of Furst's objections was that the Bank, in its victim impact statement, and the Probation Office, in its estimate of parole eligibility and guidelines sentence range, treated Furst as a thief despite this Court's reversal of both of Furst's embezzlement convictions. The Probation Office responded to Furst's objections but refused to alter its PSI report.

As a result, Furst's claim that the PSI report contained factual inaccuracies was before the district court at the time of his resentencing. The district court gave the following response to Furst's objections prior to pronouncing sentence:

Supposing for the moment I just address briefly, if you don't mind, the [objections] which were raised in regard to the pre-sentence report. There were a number of [objections] that were raised in the memorandum and in letters to the Probation Office.

. . . .

On the victim impact statement, I would have to say that this is simply a disagreement between a view of this matter between the prosecution and between the—I guess among is the right word, among the prosecution and Probation Office and the defense in this case.

There is complicated testimony in this case about what happened as a result of the defendant's conduct while he was an employee of the bank. There are complicated arguments made as to exactly what impact his conduct had on the bank and other people, if any impact, and I simply have to say that I will have to consider all that each of you is saying in trying to arrive at an appropriate sentence in this case.

I don't see any reason to remove from the pre-sentence report matters that are in there on this issue, because there isn't any question that certain parties feel they were impacted strongly and considerably by the defendant's conduct. And the defense and his counsel have just as strong arguments made as to whether that impact was significant or whether it was a direct result of the defendant's conduct. I will consider all those arguments.

. . . .

... The grading of the offense is a matter, again, of argument. I realize that defense feels strongly about the entire matter of the use of the words "theft," and the use of such terminology as whether or not the defendant was a thief. I don't think anybody labeled him as that, but there is some concern and concern of theft offenses.

But, again, it's pure argument. There is a difference of opinion as to how those

offenses will be graded. And both the grading offense, for purpose of the Parole Board's consideration, and the guidelines calculations that were made and submitted to this court are matters that the court looks at but is not guided by. This is not a guidelines case, and really the court is not governed by what the Parole Board will do. And God knows the Parole Boards does a lot of things we don't agree with, and are a great difference from our opinion as to how matters should be graded.

So, once again, I see those as not very significant matters. And they're just one of many items that a judge should look at in trying to reach a decision on what's the appropriate sentence to be induced.

Appendix (App.) at 176–79.

After making this statement, the district court permitted Furst to call two character witnesses, his brother-in-law and his wife. Then, Furst's attorney and the government's attorney made their sentencing arguments to the district court. Finally, the district court announced its sentence. The district court stated:

There seems to be considerable argument as to exactly what resulted from the defendant's conduct. The continuing argument that we hear here today as to whether there was any actual gain to the defendant. There doesn't seem to be anybody saying, or at least there is no conviction that this defendant actually received any money, or stole any money from the concept of picking it from somebody else's possession and putting it into his own pocket. And as a matter of fact we're very conscious of the fact that the Appellate Court reversed the convictions that had to do with theft.

Nonetheless, I must say for the record and it's part of my thinking process in arriving at a sentence that there were victims in this case. There are always victims when parties use the property of others in an improper fashion. One doesn't have to take money from one place and put it in your own pocket in order to harm somebody else with the

inappropriate use of their funds or their possessions. . . .

There was certainly an improper use of other people's property over a long period of time here, maneuvering and manipulating, moving it back and forth, all of which I suppose would come under the general description of white collar crime, about which we hear much lately.

. . . .

And some of those, like Mr. Furst here, the Defendant, who at least pretend or portent to understand the use of those funds sometimes, as in this case, do it illegally and improperly and the law says that that's a crime. And the hurt, the result to other parties likewise is sometimes hard to understand. When I acknowledge to you here for the record that when I read the statement of the bank as to the extent of the hurt that they, the bank officials claim occurred to them, it's hard for me to either follow it completely or to understand it thoroughly. But it doesn't take any kind of a great mental capacity to understand that this type of conduct does injure other parties.

So I have to tell you I don't buy the argument that there was no victim in this case, or that there was little hurt done to anybody. And I don't buy fully the argument that the defendant in this case did not benefit by his conduct. Certainly one of the things that's important to anybody in the position that the defendant was in was his reputation.

And everyone who's employed is concerned with several things about that employment. And one of the things you're concerned with is the maintenance of that employment, the continuation of it. And sometimes we're concerned that we have to do a good job, or a better job than the next person in order to either continue employment or to advance in employment.

And it certainly seems to me a responsible, logical, and normal conclusion in a case like this once the jury has found that this manipulation of these funds was done, that it was done for a purpose singular to the defendant. And the pur-

pose in my judgment in a case like this was to enhance the defendant's own status and his own reputation.

Whether we label that as theft to me is irrelevant. I don't think it's theft under the law. And again I say I'm acknowledging here, and I want that clear on the record that there has been a reversal of those counts on which that specific type of conduct were called, whether the words theft, or thievery, or taking was specifically used.

But nonetheless I think it's foolish, in my judgment at least as a sentencing judge, to expect me, or in my position as a sentencing judge to accept the concept that there was no purpose in this defendant's conduct. Mr. Furst is too smart, and too intelligent, and too able to accept that explanation. I'm not so sure he can accept it, but that's not uncommon in conduct of this type.

So that I find here that there is a serious matter involved; I find that there is a concern in the occurrence of white collar crime that probation and that type of sentencing has not been appropriate in the past, although it was common for probation to be the normal type of sentence in a case like this.

. . . .

Mr. Furst comes before this court with a good background; he comes before the court with a clean prior record; and he comes before the court what a variety of letters and mail that I have reviewed of people who attest to his character, good character and reputation prior to his conviction in this court.

So those things balance on the other side of the scale in trying to arrive at a sentence that's fair and appropriate. It's my judgment then that a sentence of four years of imprisonment will reflect all of the matters that I have just recited on this record. And it's based on those that I have arrived at that decision.

App. at 195–99.

Next, the district court turned its attention to the subject of restitution:

I also feel that there should be a restitution in this case, and here again I acknowledge that the exact amount of restitution is somewhat difficult to ascertain. But again the law says that because restitution cannot be ascertained specifically to the particular dollar is no reason to disallow restitution altogether.

And I'm also aware of Mr. Furst's dire financial conditions at the present time, and aware of the fact that restitution may be something for the future, and something that will have to be even looked at again if conditions so warrant it, but I will be ordering restitution in this case.

. . . .

And on restitution I order that the defendant make partial restitution in the amount of $150,000.00 to the North Central Bank of Williamsport, Pennsylvania, or to those funds that should be reimbursed for losses as determined by the United States Government in conjunction with defense counsel.

I'm ordering that type of restitution on the basis of the comments I made a minute ago.

. . . .

MR. FURST'S COUNSEL: Your Honor, when restitution was earlier imposed, the court said that there would be a credit in any amount by which the account which should not have had the money taken had succeeded in getting the money back. Did you specify that now?

THE COURT: Yes.

MR. FURST'S COUNSEL: Because I believe that the transaction in question had already been unwound.

THE COURT: I would so order that that would be a part of the restitution process.

App. at 199–202.

In conclusion, the district court announced that it had sentenced Furst under a provision of the United States Code making him immediately eligible for parole. *See* 18 U.S.C.A. § 4205(b)(2) (West 1985).[5]

---

5. Under 18 U.S.C.A. § 4205(b)(2), "a defendant need not serve the ordinary minimum one-third of his sentence before parole eligibility, but may become eligible for parole at any time the Pa-

Furst now stands sentenced to five concurrent four year terms of imprisonment and to pay restitution in the amount of $150,000.00 as well as a small special assessment.

## II.

We have jurisdiction over the final judgment of sentence the district court imposed in this pre-sentencing guidelines case pursuant to 28 U.S.C.A. § 1291 (West Supp. 1990). The district court had subject matter jurisdiction over the charges against Furst pursuant to 18 U.S.C.A. § 3231 (West 1985).

## III.

We shall examine each of the three issues Furst raises in turn.

### A.

■ Furst maintains that the district court erred in failing to resolve or expressly disclaim reliance upon factual disputes concerning (1) the Bank's victim impact statement and (2) the Probation Office's estimates of Furst's parole eligibility and guidelines sentence range as is required under Federal Rule of Criminal Procedure 32(c)(3)(D). Our review of whether the district court properly complied with the mandate of Federal Rule of Criminal Procedure 32(c)(3)(D) is plenary. *See United States v. Blanco*, 884 F.2d 1577, 1580 (3d Cir.1989) ("[C]ourts have strictly enforced the mandatory language of this rule requiring that the sentencing judge either make a finding as to the controverted fact or disclaim reliance on the fact for sentencing."); *United States v. Gomez*, 831 F.2d 453, 455 (3d Cir.1987) ("Rule 32(c)(3)(D) is phrased in mandatory language. If the district court fails to make findings as to disputed facts, it must make a determination that those disputed facts will not be taken into account."), *quoted in Blanco*, 884 F.2d at 1580.

The version of Rule 32(c)(3)(D) applicable to the offenses Furst committed provides:

If the comments of the defendant and the defendant's counsel or testimony or other information introduced by them allege any factual inaccuracy in the presentence investigation report or the summary of the report or part thereof, the court shall, as to each matter controverted, make (i) a finding as to the allegation, or (ii) a determination that no such finding is necessary because the matter controverted will not be taken into account in sentencing. A written record of such findings and determinations shall be appended to and accompany any copy of the presentence investigation report thereafter made available to the Bureau of Prisons or the Parole Commission.

Fed.R.Crim.P. 32(c)(3)(D) (rule applicable to offenses committed prior to Nov. 1, 1987).

We have written that this rule serves two important purposes. First, it ensures that the sentencing judge has an accurate PSI report to rely upon. *See United States v. Rosa*, 891 F.2d 1063, 1070 (3d Cir.1989) (*Rosa I*); *Gomez*, 831 F.2d at 457. Second, it guarantees that the Bureau of Prisons and the Parole Commission, both of which rely heavily upon the PSI report, make decisions entrusted to them concerning confinement and conditions of release based upon accurate information. *See Blanco*, 884 F.2d at 1579–80; *Gomez*, 831 F.2d at 457.

■ Arguing that Rule 32(c)(3)(D) compels us to vacate his sentence, Furst first contends that the district court should have resolved his objections concerning the Bank's victim impact statement or expressly disclaimed reliance upon it. Furst does not dispute that the version of Federal Rule of Criminal Procedure 32(c)(2)(C) applicable to his offenses permits the district court to consider a victim impact statement. Instead, he argues that the Bank's victim impact statement impermissibly refers to him as a thief, despite this Court's

role Commission determines." *United States v. Felder*, 744 F.2d 18, 19 (3d Cir.1984). Congress repealed this provision effective November 1, 1987, in conjunction with the advent of the

sentencing guidelines. *See* Comprehensive Crime Control Act of 1984, Pub.L. No. 98–473, Title II, § 218(a)(5), 98 Stat. 2027 (1984).

earlier reversal of the only two embezzlement counts for which he was convicted.

The government responds to Furst's argument by noting that the district court stated on the record at sentencing that it viewed both the Bank's victim impact statement and Furst's objection to it as arguments, not facts. Because Rule 32(c)(3)(D) applies only to alleged factual inaccuracies, the government argues that the district court acted properly in not resolving the dispute. In referring to the dispute as one concerning "arguments," the government contends that the district court in effect stated that it would not rely upon the controverted matter as facts to be taken into account in Furst's sentencing.

Second, Furst maintains that the district court violated Rule 32(c)(3)(D) by failing to resolve his objections to or expressly disclaim reliance upon the Probation Office's estimate of when he would be eligible for parole. The government again responds by noting that the district court stated it viewed the Probation Office's estimate of what the Parole Commission would do as "pure argument." The district court also noted that the Parole Commission's decision to grant parole is solely within the Commission's discretion. Thus, the government contends that the Probation Office's estimate is neither binding upon the district court nor upon the Parole Commission when it reviews Furst's case.

Third, Furst argues that the district court violated Rule 32(c)(3)(D) when it failed to resolve his objections to or expressly disclaim reliance upon the Probation Office's estimate of what his sentence would be if the sentencing guidelines were applicable. The government responds that the district court correctly stated that the guidelines do not apply to Furst's case and that such a statement is the equivalent of the district court expressly disclaiming reliance upon the guidelines estimate. The government also faults Furst for not requesting a hearing pursuant to the Second Circuit's decision in *United States v. Fatico,* 603 F.2d 1053 (2d Cir.1979), *cert. denied,* 444 U.S. 1073, 100 S.Ct. 1018, 62 L.Ed.2d 755 (1980), if he felt that factual contentions remained in dispute.

We do not agree with the government's contention that the district court complied with the mandate of Rule 32(c)(3)(D) when it characterized the Bank's victim impact statement, the PSI report's reliance upon the statement and the PSI report's estimate of Furst's parole eligibility as matters of argument. Rather, we agree with Furst that once he informed the district court that he disputed facts contained in the PSI report, it was required, pursuant to Rule 32(c)(3)(D), either to make findings concerning the alleged factual inaccuracies or expressly to disclaim reliance upon them. *See Gomez,* 831 F.2d at 457 (under Rule 32(c)(3)(D), if district court chooses not to make findings as to the alleged factual inaccuracies, it must explicitly state it will not rely on disputed information).

We find Furst's case remarkably similar to the appeal we decided in *United States v. Rosa,* 891 F.2d 1071, 1073 (3d Cir.1989) (*Rosa II*). In *Rosa II,* the government and defendant Nicklow each presented the district court with a version of the events underlying Nicklow's plea of guilty to two counts of the indictment against him. Instead of resolving the differences between the two versions, the district court stated:

> [T]he Government has [had] the opportunity to present their version of the offenses as well as the defendant has an opportunity to present their version of the offense. Both versions are made part of the pre-sentence report and remain part of it. Those are not the facts. Those are versions of the offense as set forth by both the Government and the defendant.

*Id.*

We held in *Rosa II* that the district court failed to comply with the mandate of Rule 32(c)(3)(D). Our reasoning in *Rosa II* requires a similar holding here. Even though the district court characterized Furst's objections to the PSI report as "arguments," it nevertheless was required either to resolve the factual dispute at the core of such arguments or expressly to disclaim reliance upon those disputed facts.

■ Similarly, the district court should have followed the mandate of Rule 32(c)(3)(D) with regard to Furst's objection to the estimate of his guidelines sentence range contained in the PSI report. We do not understand why the district court would grant Furst's request to have the Probation Office calculate an estimate of his guidelines sentence range when the district court knew that the guidelines had no application to his sentencing; however, once such information was included in the PSI report, Rule 32(c)(3)(D) became fully applicable to it. It was not enough for the district court to state that the guidelines were inapplicable. This is not the same thing as expressly disclaiming reliance upon the guidelines sentence estimate.

■ We also reject the government's argument that Furst waived his objections to the contents of the PSI report when he failed to request a *Fatico* hearing. In not one of the Rule 32(c)(3)(D) cases we have decided have we suggested that the defendant must request a hearing to resolve factual disputes contained in the PSI.

■ Instead, Rule 32(c)(3)(D) itself directs the district court, as to each matter controverted, either expressly to disclaim reliance upon the matter or to make a finding as to the allegation. Thus, once the defendant alleges a factual inaccuracy in his PSI report, the rule places the burden upon the district court to determine whether, as an initial matter, it wishes to rely upon the disputed fact and, if so, whether a hearing is necessary to make a finding upon the disputed matter. *See Gomez*, 831 F.2d at 457 & n. 3.

Where a district court has failed to follow the mandate of Rule 32(c)(3)(D), we have consistently vacated the defendant's sentence and remanded the matter to the district court. Thus, we must do the same today. On remand, the district court can expressly state that it did not rely upon the information Furst disputes and then promptly impose sentence. Otherwise, it must make findings concerning the information that Furst disputes.

### B.

We can now quickly put aside Furst's argument that the district court violated his right to due process when it allegedly relied upon erroneous information and assumptions in sentencing him. Our scope of review is plenary. *See United States v. Cifuentes*, 863 F.2d 1149, 1150 (3d Cir. 1988).

Furst's constitutional argument is focused upon the very same information that is the subject of his Rule 32(c)(3)(D) argument. Because we agree with Furst that his sentence must be vacated due to the district court's failure to comply with Rule 32(c)(3)(D) and because the rule operates to guarantee the very right that Furst claims has been constitutionally infringed upon, we will not reach his constitutional claim.

On remand, it will become clear whether the district court relied upon information that Furst disputes. If the district court wishes to rely upon such information, it must make findings either based upon the evidence already before it or upon evidence adduced at a hearing. *See supra* typescript at 407–08. We have recognized that Rule 32(c)(3)(D) operates to guarantee a defendant's due process right not to be sentenced based upon " 'materially false' information." *See United States v. McDowell*, 888 F.2d 285, 290–91 (3d Cir.1989) (citing *Townsend v. Burke*, 334 U.S. 736, 741, 68 S.Ct. 1252, 1255, 92 L.Ed. 1690 (1948) and *Cifuentes*, 863 F.2d at 1153).

### C.

■ Furst's final argument on appeal is that the district court erred in ordering restitution when the record, he alleges, reveals no factual or legal basis to support a restitution award. Our review of whether the district court incorrectly imposed an order of restitution is bifurcated: we exercise plenary review over whether the award is permitted under law but we review the particular award for abuse of discretion. *See United States v. Pollak*, 844 F.2d 145, 152 (3d Cir.1988); *United States v. Palma*, 760 F.2d 475, 480 (3d Cir.1985).

The district court ordered Furst to pay $150,000.00 in restitution to the Bank "or to those funds that should be reimbursed for losses as determined by the United States Government in conjunction with defense counsel." App. at 200. The district court based its order of restitution upon a provision of the Victim and Witness Protection Act of 1982 (VWPA), which has been recodified at 18 U.S.C.A. § 3663 (West 1985 & Supp.1990). The statute provides, in relevant part:

> (a) The court, when sentencing a defendant convicted of an offense under this title ... may order, in addition to or, in the case of a misdemeanor, in lieu of any other penalty authorized by law, that the defendant make restitution to any victim of such offense.
>
> (b) The order may require that such defendant—
>
> (1) in the case of an offense resulting in damage to or loss or destruction of property of a victim of the offense—
>
> (A) return the property to the owner of the property or someone designated by the owner; or
>
> (B) if return of the property under subparagraph (A) is impossible, impractical, or inadequate, pay an amount equal to the greater of—
>
> (i) the value of the property on the date of the damage, loss, or destruction, or
>
> (ii) the value of the property on the date of sentencing,
>
> less the value (as of the date the property is returned) of any part of the property that is returned.

18 U.S.C.A. § 3663(a) & (b)(1).

At the time of resentencing, Furst stood acquitted of all theft offenses. Thus, he argues that the district court erred in imposing restitution without connecting it solely to the false statement offenses for which he remained convicted. The government responds that the district court's order of restitution should be upheld because Furst's actions were intended to cover up losses in the commodities accounts. Therefore, it argues, he should be forced to repay the money lost in the failed commodities investment.

Last Term the Supreme Court, in *Hughey v. United States,* —— U.S. ——, 110 S.Ct. 1979, 1981, 109 L.Ed.2d 408 (1990), considered the VWPA's restitution provision here at issue and wrote: "We hold that the language and structure of the Act make plain Congress' intent to authorize an award of restitution only for the loss caused by the specific conduct that is the basis of the offense of conviction." In *Hughey,* the petitioner pleaded guilty to a single count of a multi-count indictment charging him with stealing credit cards from the mail and defrauding several banks through use of the stolen cards. The one count to which Hughey entered his plea charged him with fraudulent use of an MBank credit card issued to Hershey Godfrey. Prior to sentencing, the government informed Hughey that it intended to ask the district court to order restitution in an amount reflecting the losses Hughey caused to several banks as a result of his alleged theft and use of thirty different credit cards. *Id.*

At sentencing, the district court imposed restitution totalling $90,431.00. That sum reflected the total loss MBank sustained as a result of Hughey's fraudulent use of credit cards belonging to twenty-one MBank cardholders. *Id.* 110 S.Ct. at 1981–82. Hughey appealed, arguing that the VWPA did not permit the district court to order restitution in an amount exceeding $10,412.00, the loss MBank sustained from Hughey's use of Godfrey's credit card. The United States Court of Appeals for the Fifth Circuit rejected Hughey's argument and affirmed the district court's restitution order. *Id.,* 110 S.Ct. at 1982 (quoting *United States v. Hughey,* 877 F.2d 1256, 1264 (5th Cir.1989)).

The Supreme Court reversed. It held that under the VWPA restitution could only be imposed in the amount of $10,412.00, because that was the loss caused by the offense of conviction. *See id.,* 110 S.Ct. at 1986. In so doing, the Supreme Court rejected the decisions of a number of courts of appeals that had permitted resti-

tution in the full amount of the loss caused by a unified scheme so long as a single conviction arose out of the scheme. Instead, the Supreme Court wrote that the VWPA specifies both to whom and how much restitution can be imposed. *See id.* at 1983. Under the VWPA, the Supreme Court held, "the loss caused by the conduct underlying the offense of conviction establishes the outer limits of a restitution order." *Id.* at 1984.

In order to facilitate meaningful appellate review of orders of restitution imposed pursuant to the VWPA, we have "invoke[d] our supervisory power to require the district courts ... to make specific findings as to the factual issues that are relevant to the application of the restitution provisions of the VWPA." *United States v. Palma*, 760 F.2d 475, 480 (3d Cir.1985).

In Furst's case, the district court announced the amount of restitution it would order, stated that the amount reflected partial restitution and directed that it be paid to the Bank "or to those funds that should be reimbursed for losses...." App. at 200. In response to a question from Furst's counsel, the district court stated that the amount of restitution imposed would be reduced after the owners of the accounts Furst used in carrying out his scheme untangled or "unwound" the effects of that scheme among themselves and the Bank. *Id.* at 201–02.

However, the district court awarded partial restitution without stating on the record the total amount of restitution that it had the power to impose, expressly identifying who Furst victimized or explaining how the amount of partial restitution imposed was related to any loss caused by the conduct underlying the false statement offenses for which Furst remained convicted. In part, this may be due to the fact that the district court did not have the benefit of the Supreme Court's decision in *Hughey*, which was decided on May 21, 1990, when it imposed its order of restitution on March 9, 1990.

█ We have already held that Furst's sentence must be vacated because of the district court's failure to comply with Rule 32(c)(3)(D). Inasmuch as the order of restitution is part of Furst's sentence, it too will be vacated. On remand, if the district court wishes to impose restitution as part of Furst's sentence, it must do so in conformity with *Hughey* and *Palma*. Thus, the district court should set forth specific findings showing how the amount of restitution imposed relates to the loss caused by the offenses for which Furst remains convicted.

In the current posture of this case, we decline Furst's invitation to hold that his convictions cannot support an order of restitution under the VWPA. We will leave this question open for the district court to consider on remand. It is much more familiar than we are concerning the specific offenses for which Furst remains convicted and whether they caused any loss as defined in the VWPA. We do agree with Furst, however, that the district court cannot impose any restitution upon him based on the embezzlement convictions we reversed in *Furst I.* For the same reason, we cannot accept the government's argument that restitution can be imposed based upon losses incurred as a result of Furst's failed commodities investment. As we stated in our prior opinion, Furst has not been charged with any crime as a result of making the failed commodities investment. *See Furst I*, 886 F.2d at 562 n. 2.

### IV.

We will vacate Furst's sentence in its entirety and remand this matter to the district court. On remand, the district court, before imposing sentence, is directed either to make findings on the disputed facts or disclaim reliance on them in accord with Rule 32(c)(3)(D). If on remand the district court chooses to impose an order of restitution as part of its sentence, it is also directed to set forth specific findings showing how the amount of restitution imposed relates to the losses caused by the conduct underlying the offenses for which Furst remains convicted.